# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

| | | |
|---|---|---|
| Julia Cavazos, | 15001 35th Ave. W, Apt. 12202 <br> Lynwood, WA 98087 | ) <br> ) <br> ) <br> ) |
| Nancy Cisneros, | 2220 Broadway, Apt. 2 <br> Everett, WA 98201 | ) <br> ) <br> ) |
| Debra Cicalo, | 435 S. Isabella Rd. <br> Mt. Pleasant, MI 48858 | ) <br> ) <br> ) |
| Darrell Coon, | 5637 Lawndale Rd. <br> Saginaw, MI 48604 | ) <br> ) <br> ) |
| Elizabeth Douglas, | 6326 Mount Palomar Ave. <br> Las Vegas, NV 89139 | ) <br> ) <br> ) |
| Wanda Ellis, | 15930 Zuehlke Rd. <br> Albion, MI 49224 | ) <br> ) <br> ) |
| Eligah Bear Fisher, | 4621 Makwa Dr. <br> Hersey, MI 48639 | ) <br> ) <br> ) |
| John Fisher, | 4609 Makwa Dr. <br> Hersey, MI 48639 | ) <br> ) <br> ) |
| Daniel J. Fowler, | 301 Hanchett St. <br> St. Charles, MI 48655 | ) <br> ) <br> ) |
| James A. Fowler, | 1893 Wood St. <br> Saginaw, MI 48602 | ) <br> ) <br> ) |
| Joey D. Fowler, | 13725 W. Townline Rd. <br> St. Charles, MI 48655 | ) <br> ) <br> ) |
| Rick A. Fowler, | 1265 N. Main St. <br> Saint Charles, MI 48655 | ) <br> ) <br> ) |
| Roy Fowler, | 1113 Chesaning St. <br> St. Charles, MI 48655 | ) <br> ) <br> ) |
| Dale L. Fowler, Jr., | 526 Hanchett St. <br> St. Charles, MI 48655 | ) <br> ) <br> ) |

Civil Action No. 1:20-cv-2942

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

|  |  |  |
|---|---|---|
| | | ) |
| Connie Freiburger, | 3277 1st One #7 | ) |
| | Mims, FL 32754 | ) |
| | | ) |
| Michelle Garvey, | 4125 Old King Rd. | ) |
| | Saginaw, MI 48601 | ) |
| | | ) |
| Jackie L. Gibbs, | 5502 East Morris | ) |
| | Mt. Morris, MI 48458 | ) |
| | | ) |
| Angela Gomez, | 1402 Lamson | ) |
| | Saginaw, MI 48601, | ) |
| | | ) |
| Andrea Gonzales, | 3189 Mylsylvia Dr. | ) |
| | Saginaw, MI 48601 | ) |
| | | ) |
| Mary Lou Gonzales, | 9815 Holly Dr. #A112 | ) |
| | Everett, WA 98204 | ) |
| | | ) |
| Celeste Hamner, | 14278 Elmhurst Dr. | ) |
| | Sterling Heights, MI 48313 | ) |
| | | ) |
| Linda Haven, | 5392 Elm St. | ) |
| | Standish, MI 48658 | ) |
| | | ) |
| Estate of | | ) |
| Dolores Hernandez, | 1449 Joseph St. | ) |
| | Saginaw, MI 48638 | ) |
| | | ) |
| Estate of | | ) |
| Dolly Holzhausen, | 3831 Easton Rd. | ) |
| | Owosso, MI 48867 | ) |
| | | ) |
| Esperanza Jaquez, | 2735 Tatham | ) |
| | Saginaw, MI 48601 | ) |
| | | ) |
| Sue Kusowski, | 3070 E. Verne Rd. | ) |
| | Burt, MI 48417 | ) |
| | | ) |
| Don Lown, | 1850 Seminole Ln. | ) |
| | Saginaw, MI 48638 | ) |
| | | ) |
| Kenneth G. Lown, | 210 Herlil Circle | ) |
| | Carenco, LA 70520 | ) |
| | | ) |
| Donette Maney, | 3265 Coolidge Hwy. | ) |

|                     |                          |   |
|---------------------|--------------------------|---|
|                     | Rochester Hills, MI 48309 | ) |
|                     |                          | ) |
| LuAnn H. McNally,   | 526 Hanchett St.         | ) |
|                     | St. Charles, MI 48655    | ) |
|                     |                          | ) |
| Margaret Moncado,   | 2815 Douglass St.        | ) |
|                     | Saginaw, MI 48601        | ) |
|                     |                          | ) |
| Alice Moore-Barton, | 691 E. Weidman           | ) |
|                     | Mt. Pleasant, MI 48858   | ) |
|                     |                          | ) |
| Gloria Narvais,     | 3920 Miigwan Ln.         | ) |
|                     | Mt. Pleasant, MI 48858   | ) |
|                     |                          | ) |
| Mickey Nieto,       | 1908 Glenwood            | ) |
|                     | Saginaw, MI 48601        | ) |
|                     |                          | ) |
| Annette Ott,        | 6760 Eaton Rapids Rd.    | ) |
|                     | Albion, MI 49224-9302    | ) |
|                     |                          | ) |
| David Otto,         | 12924 Erie Rd.           | ) |
|                     | Albion, MI 49224         | ) |
|                     |                          | ) |
| Estate of           |                          | ) |
| Donulus Otto,       | 6760 Eaton Rapids Rd.    | ) |
|                     | Albion, MI 49224         | ) |
|                     |                          | ) |
| Patrick Otto,       | 2406 Intertown Rd.       | ) |
|                     | Petoskey, MI 49770       | ) |
|                     |                          | ) |
| Bernardino Perez,   | 1827 Woodland Dr.        | ) |
|                     | Mt. Pleasant, MI 48858   | ) |
|                     |                          | ) |
| Feliz Perez,        | 135 E. Warsau Ave.       | ) |
|                     | Mt. Pleasant, MI 48858   | ) |
|                     |                          | ) |
| Estate of           |                          | ) |
| Simon Perez,        | 6254 Longmeadow Blvd. S. | ) |
|                     | Saginaw, MI 48603        | ) |
|                     |                          | ) |
| Laurence Peters,    | 5841 W. 12 Rd.           | ) |
|                     | Mesick, MI 49668         | ) |
|                     |                          | ) |
| Estate of           |                          | ) |
| Judy M. Potter,     | 2496 Sue Ann Ln.         | ) |
|                     | Flint, MI 48507          | ) |

|  |  | ) |
| --- | --- | --- |
| Sally Quiroga, | 3840 N. Hartford Dr. | ) |
|  | Saginaw, MI 48603 | ) |
|  |  | ) |
| Sylvia Quiroga, | 2343 N. Bond | ) |
|  | Saginaw, MI 48602 | ) |
|  |  | ) |
| Faye Roby, | 15524 U.S. Highway 23N | ) |
|  | Millersburg, MI 48759 | ) |
|  |  | ) |
| Estate of | | ) |
| Andy Shuler, | 19087 W. Brant Rd. | ) |
|  | Brant, MI 48614 | ) |
|  |  | ) |
| Bryan Shuler, | 11946 Baumgartner Rd. | ) |
|  | St. Charles, MI 48655 | ) |
|  |  | ) |
| Alton Smith, | 251 W. Townsend Rd. | ) |
|  | Twining, MI 48766 | ) |
|  |  | ) |
| Dolores Otto | | ) |
| (formerly Smith), | 6326 Mount Palomar Ave. | ) |
|  | Las Vegas, NV 89139 | ) |
|  |  | ) |
| Estate of | | ) |
| Mary Ann Smith, | 251 W. Townsend Rd. | ) |
|  | Twining, MI 48766 | ) |
|  |  | ) |
| Vicki Steffen, | P.O. Box 116, Houghton | ) |
|  | Lake Heights, MI 48630 | ) |
|  |  | ) |
| Lisa Swint | 1012 W. Belmont Red Trl. | ) |
| (nee Kearney), | San Tan Valley, AZ 85143 | ) |
|  |  | ) |
| Christine M. Theile, | 801 E. Liberty St. | ) |
|  | Chesaning, MI 48616 | ) |
|  |  | ) |
| Barbara Ellen Vance, | 12966 Hawkins Rd. | ) |
|  | Burt, MI 48417 | ) |
|  |  | ) |
| Barry Allen Vance, | 4953 Midnight Ln. | ) |
|  | Sarasota, FL 34235 | ) |
|  |  | ) |
| Bill L. Vance, | 380 N. Fenmore Rd. | ) |
|  | Merrill, MI 48637 | ) |
|  |  | ) |

Brian Scott Vance,  12966 Hawkins Rd.   )
        Burt, MI 48417     )
                   )
Carol Wheaton,   150 W. North St., Apt. 3P )
        St. Charles, MI 48655   )
                   )
Frank J. Wheaton,  1717 Castle Rd.    )
        North Branch, MI 48461  )
                   )
  Estate of               )
Jack G. Wheaton,   3070 E. Verne Rd.   )
        Burt, MI 48417     )
                   )
James J. Wheaton,  10110 Frost     )
        Freeland, MI 48623   )
                   )
James W. Wheaton,  7751 Loud Dr.    )
        Oscoda, MI 48750    )
                   )
John Wheaton,    11069 Bell Rd.    )
        Burt, MI 48417,    )
                   )
           Plaintiffs,   )
                   )
      v.             )
                   )
DAVID BERNHARDT, in his official capacity as )
Secretary of the Interior,        )
                   )
TARA SWEENEY, in her official capacity  )
as Assistant Secretary for Indian     )
Affairs of the Department of the Interior,  )
                   )
and                 )
                   )
DARRYL LACOUNTE, in his official capacity as )
Director of the Bureau of Indian Affairs,  )
                   )
           Defendants.  )
_____)

## INTRODUCTION

1.  This action under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, challenges the failure of the Secretary of the Interior (the "Secretary") and other senior officials of the U.S. Department of the Interior (the "DOI") to enforce The Saginaw Chippewa Indian Tribe of Michigan Distribution of Judgment Funds Act, Pub. L. No. 99-346, 100 Stat. 674 (1986) (the "Judgment Funds Act" or the "JFA"). Plaintiffs seek to compel the Secretary to exercise his mandatory authority under the JFA to require the Saginaw Chippewa Indian Tribe of Michigan (the "Tribe") to restore plaintiffs to their status as enrolled members and to restore the benefits to which plaintiffs are entitled under the JFA but which have been unlawfully withheld by the Tribe.

2.  Plaintiffs are descendants of the Swan Creek, Black River, and Saginaw Bands of Chippewa Indians (the "Bands") and members of the Tribe, who have been unlawfully stripped of their Tribal membership (i.e., "disenrolled") by the Tribe in violation of the JFA.

3.  In 1986, the JFA provided for the distribution of funds (the "JFA funds") awarded by the United States to the descendants of the Bands, in compensation for lands ceded under treaties between the United States and the Bands in the early 1800s. Departing from the prior practice of distributing judgment funds on a per capita basis, the JFA provided for the distribution of all JFA funds into an Investment Fund managed by the Tribe (the "Investment Fund").

4.  As a condition precedent for the transfer of the JFA funds to the Tribe, the JFA required that the Tribe amend its original 1937 Constitution to permit the enrollment into the Tribe of individuals who were descendants of the Bands, but whose families had been wrongfully excluded from the Tribe under a constitutional provision imposed by the United

1

States government which made residency on the Tribe's reservation a requirement for membership.

5.    The Tribe ratified the required constitutional amendments in November 1986, and then began to enroll additional members, including plaintiffs.

6.    To ensure that the benefits of the JFA funds would be shared equitably among all members of the Tribe, the JFA prohibited any discrimination in the use of the Investment Fund against members enrolled under the amended Constitution (the "nondiscrimination mandate"), and required the Secretary to take all "necessary and appropriate" action to enforce the JFA's terms.

7.    After receiving the JFA funds and complying with the JFA's terms for nearly a decade, in 1996 the Tribal Council began a campaign to expel hundreds of Tribe members who had either enrolled under the amended Constitution or were the children of enrollees. Between 2016 and 2017, each of the plaintiffs was disenrolled from the Tribe, in violation of the JFA.

8.    Disenrollment deprived plaintiffs of the many benefits of Tribal membership, including health insurance, Tribal health care services and providers, educational subsidies, and per capita cash payments. Most of all, it robbed them of their Tribal heritage and identity, displacing them from their community and inflicting severe emotional distress.

9.    Plaintiffs petitioned the Secretary to enforce the JFA's nondiscrimination mandate. The Secretary's designee denied the petition on the ground that the JFA does not give the Secretary authority to intervene in matters of Tribal membership. *See* Disenrollments by Saginaw Chippewa Tribe of Michigan, Interior Dec. slip op. (IBIA Jan. 30, 2020) ("January 30 Decision").

10.    The Secretary's decision nullifies the JFA's nondiscrimination mandate and is at

2

odds with Congress's goal in the JFA: to ensure that *all* of the Tribe's members, including those newly enrolled, share equally in both the JFA funds and any benefits from the use thereof.

11. For these reasons, the Court should find that the Secretary has "unlawfully withheld or unreasonably delayed" agency action and that the January 30 Decision is "arbitrary, capricious, an abuse of discretion" and "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court should "hold unlawful and set aside" the Secretary's ruling, *id.* § 706(2), and enter declaratory and injunctive relief compelling defendants to enforce the JFA by directing the Tribe to reinstate plaintiffs as Tribe members and restore all benefits of Tribal membership that have been withheld since their expulsion from the Tribe, with accumulated interest.

## JURISDICTION

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## PARTIES

13. Plaintiffs Julia Cavazos, Nancy Cisneros, Debra Cicalo, Darrell Coon, Elizabeth Douglas, Wanda Ellis, Eligah Bear Fisher, John Fisher, Daniel J. Fowler, James A. Fowler, Joey D. Fowler, Rick A. Fowler, Roy Fowler, Dale L. Fowler, Jr., Connie Freiburger, Michelle Garvey, Jackie L. Gibbs, Angela Gomez, Andrea Gonzales, Mary Lou Gonzales, Celeste Hamner, Linda Haven, the Estate of Dolores Hernandez, the Estate of Dolly Holzhausen, Esperanza Jaquez, Sue Kusowski, Don Lown, Kenneth G. Lown, Donette Maney, LuAnn H. McNally, Margaret Moncado, Alice Moore-Barton, Gloria Narvais, Mickey Nieto, Annette Ott, David Otto, the Estate of Donulus Otto, Patrick Otto, Bernardino Perez, Feliz Perez, the Estate of Simon Perez, Laurence Peters, the Estate of Judy M. Potter, Sally Quiroga, Sylvia Quiroga, Faye Roby, the Estate of Andy Shuler, Bryan Shuler, Alton Smith, Dolores Otto

(formerly Smith), the Estate of Mary Ann Smith, Vicki Steffen, Lisa Swint, Christine M. Theile, Barbara Ellen Vance, Barry Allen Vance, Bill L. Vance, Brian Scott Vance, Carol Wheaton, Frank J. Wheaton, the Estate of Jack G. Wheaton, James J. Wheaton, James W. Wheaton, John Wheaton, are members of the Tribe, enrolled pursuant to the JFA and Article III of the Constitution of the Saginaw Chippewa Indian Tribe of Michigan, as amended in 1986 (the "1986 Constitution"), but who have been disenrolled  by the Tribe in violation of Sections 3, 4, and 9 of the JFA.

14.   Plaintiffs have suffered and continue to suffer serious psychological, economic, and physical harms due to their expulsion from the Tribe.

15.   Defendant David Bernhardt, Secretary of the DOI, is charged with the responsibility of enforcing the requirements of the JFA. Defendant Bernhardt is sued in his official capacity.

16.   Defendant Tara Sweeney, Assistant Secretary of Indian Affairs of the DOI, is responsible for assisting Secretary Bernhardt in enforcing the requirements of the JFA. Defendant Sweeney is sued in her official capacity.

17.   Defendant Darryl LaCounte, Director of the Bureau of Indian Affairs (the "BIA"), is responsible for carrying out the federal duty to protect and improve the trust assets of American Indians, Alaska Natives, and Indian tribes, including the trust assets that are at stake in this case. Defendant LaCounte is sued in his official capacity.

## HISTORICAL AND FACTUAL BACKGROUND

### Creation of the Saginaw Chippewa Indian Tribe of Michigan

18.   In a series of four treaties between 1805 and 1819, the Swan Creek, Black River, and Saginaw Bands of Chippewa Indians treated jointly with, and ceded lands to, the United

States, for a fraction of the lands' value.

19.   Beginning in 1855, the United States conducted relations with the three Bands as a single Tribe. Two treaties in 1855 and 1864 between the United States and the Tribe created the 82,000-acre Isabella Reservation (the "Reservation").

20.   By 1891, all of the available land in the Reservation was eventually allotted to members of the Tribe, pursuant to the federal government's contemporaneous policy toward Native Americans. These allotments were recorded on a series of allotment rolls between 1871 and 1891.

21.   The rolls from 1871 and 1872 contain the names of older generations of members who received their allotments at the beginning of the process. The rolls from 1883, 1885, and 1891 contain the names of tribal members who became twenty-one years old after the original round of allotments.

22.   The 1871 and 1872 rolls record over eighty-five percent of the Tribe's documented ancestors. The 1883, 1885 and 1891 rolls record less than fifteen percent.

23.   Fraud and mismanagement plagued the Tribe's disastrous allotment process.

24.   Because of this fraud and mismanagement, few of the Tribe's members ever took possession of the land allotted to them and, as a result, most Tribe members returned to their traditional villages and scattered across 250 miles of Lower Michigan. For example, by the 1930s, only about 1,600 acres of the 82,000 acre Reservation remained in trust and in Indian hands, and only one-third to one-half of the Tribe had ever lived on the Reservation.

25.   From 1855 to 1937, the Tribe was the sole successor in interest to the Bands, because its membership included all descendants of those Bands, regardless of whether those descendants lived on the Reservation.

**The 1937 Constitution**

26.   In 1934, Congress passed the Indian Reorganization Act, 25 U.S.C. § 5101 *et seq.* ("IRA"), which required the Tribe to adopt bylaws and a constitution to benefit from numerous federal protections. Under the IRA, the Tribe's draft constitution had to be approved by the Commission of Indian Affairs, the forerunner of the Bureau of Indian Affairs.

27.   The Tribe's initial draft constitution included as Tribe members all descendants of the Bands, regardless of where the descendants were located, because Tribe members remained united by heritage, even though government malfeasance forced them to scatter across the region.

28.   Unfortunately, much like the allotment process, incompetence and negligence by the federal government plagued the Tribe's efforts to create a constitution pursuant to the IRA.

29.   An agent of the Commissioner of Indian Affairs forced the Tribe to include a constitutional provision requiring Tribe members to reside on the Reservation (the "residency requirement").

30.   The agent also required the Tribe to use only the 1883, 1885, and 1891 land allotment rolls as the Tribe's constitutional base rolls for future Tribe membership determinations, which automatically excluded 85% of the Tribe's ancestors.

31.   The Tribe incorporated the government-mandated changes and ratified the revised Constitution in 1937 (the "1937 Constitution"). As a result of the government-imposed residency requirement, all members living off-reservation—the majority of members—were severed from the Tribe.

**Award of Funds to the Descendants of the Bands for Lands Taken by the United States**

32.   In 1946, Congress established the Indian Claims Commission (the "ICC") to

6

decide cases involving Indians' claims against the federal government. In the 1970s, the Tribe won several judgments before the ICC and the United States Court of Claims as compensation for lands that the United States took from the Saginaw, Swan Creek, and Black River Bands in the 1800s.

33.   The judgments were allocated in four "Dockets": Dockets 13-E, 57, and 59 before the ICC, and Docket 13-F before the United States Court of Claims. Docket 13-E dealt with lands ceded by the Treaty of July 4, 1805. Docket 13-F dealt with lands ceded by the Treaty of September 29, 1817. Docket 57 dealt with lands ceded by the Treaty of September 24, 1819. Docket 59 dealt with lands ceded by the Treaty of November 17, 1807.

34.   Before any judgment funds could be disbursed, Congress and the Secretary were required by statute, the Indian Judgment Fund Distribution Act, Pub. L. No. 93-134, 87 Stat. 466 (1973), to approve the plans for their distribution.

### The 1976 Report

35.   The first plan was drafted for judgment funds from Docket 57, totaling $16,786,642.09. Prior to finalizing the plan, the BIA conducted research into the Tribe's history and in 1976 prepared a report (the "1976 Report") to ensure the judgments funds would be distributed to the proper recipients. The 1976 Report concluded that a substantial number— approximately eighty percent—of the Bands' descendants, although not qualified for membership in the Tribe under the 1937 Constitution, were legally entitled to participate in the judgment funds for Docket 57 because they could trace their Indian ancestry to one of the three Bands—the Saginaw, Swan Creek, and Black River Bands—who had been parties to the 1819 Treaty.

36.   Based on the 1976 Report, the Secretary recognized that it would be improper to

award the entirety of the Docket 57 judgment funds to the Tribe (which, following the ratification of the 1937 Constitution, was no longer the sole successor in interest to the Bands). Instead, the plan approved and implemented by the Secretary included a distribution of $13,168,617.12 of the Docket 57 judgment funds, or about seventy-nine percent of the total, to 3,243 of the Bands' descendants who had been excluded from Tribal membership under the 1937 Constitution. The remaining $3,618,024.97 of the Docket 57 judgment funds, approximately 21% of the total, was distributed to the Tribe and its enrolled members.

### The 1983 Report

37.  In 1983, the BIA prepared an additional report (the "1983 Report") to ensure the remaining Dockets would be distributed to the proper individuals. Similar to the 1976 Report, the 1983 Report concluded that the Tribe's membership did not include most descendants eligible to receive the judgment funds from Dockets 13-E, 13-F, and 59. Because the Tribe had excluded these individuals, the BIA proposed to Congress the same per capita distribution formula to allocate the remaining judgment funds.

38.  All plaintiffs have a lineal ancestor listed on the 1871 or 1872 allotment rolls. All plaintiffs or their parents would have received distributions of the remaining judgment funds under the BIA's proposed distribution plan.

### The Judgment Funds Act of 1986

39.  The Tribe opposed the BIA's per capita distribution plan for the remaining judgment funds as described in the 1983 Report. In lieu of a per capita distribution, the Tribe urged Congress to pass legislation so that the Tribe would directly receive and control all the judgment funds for use in community and economic development.

40.  The BIA and most of the Band's descendants opposed the Tribe's proposal,

because payment of the judgment funds directly to the Tribe would unfairly exclude approximately eighty percent of the rightful beneficiaries.

41.  To resolve the disagreement between the BIA and the Tribe, Congress enacted the Judgment Funds Act of 1986. The JFA permitted the DOI to distribute the remaining judgment funds (the JFA funds) to the Tribe. The JFA made explicit that, as a condition precedent to receiving the JFA funds, the Tribe would be required to amend its 1937 Constitution to allow for enrollment of descendants of the Bands who were improperly excluded from membership under the 1937 Constitution.

42.  Section 4(a) of the JFA specified the content of the required amendments: namely, to eliminate the residency requirement for membership and hold an eighteen-month open-enrollment period, during which all individuals of at least one-quarter degree Indian blood who could trace their ancestry to the Bands could apply to become members of the Tribe.

43.  Congress structured the JFA to ensure that the JFA funds would benefit all members of the Tribe, including any descendants of the Bands who became members during the open-enrollment period:

    a.  Congress established procedures to ensure that the enrollment of new members was successfully completed before the transfer of the JFA funds. Section 3(a) of the JFA establishes an Investment Fund, to be administered by the Tribe in accordance with the terms of the JFA. Section 3(b)(3) states that income from the JFA funds could not be distributed until eighteen months after the date that the amendments to the Tribe's 1937 Constitution were adopted and ratified. By delaying distribution of income from the JFA funds, Congress intended to ensure that qualified descendants

of the Bands who wanted to rejoin the Tribe could become members and thereby
share in the benefit of the JFA funds.

b.  Congress limited the Tribe's ability to amend its constitution to undo the 1986
amendments. Section 4(b) prohibited the Tribe from adopting additional
amendments to the 1986 Constitution within eighteen months of the adoption of the
amendments required by the JFA. It also reiterated that, even after the expiration of
those eighteen months, the Tribe could not further amend its constitution without
prior approval by the Secretary.

c.  Congress included a nondiscrimination mandate in the JFA. Section 9 prohibits the
Tribe from discriminating in the "distribution or expenditure of the income of the
Investment Fund" against two distinct groups: (1) individuals who became
members after the date of the amendments required by Section 4(a); and (2)
members of the Tribe who reside outside the Reservation.

d.  Finally, Congress conferred enforcement authority to the Secretary. The first
sentence of Section 5(b)(2) places a mandatory duty on the Secretary to take all
action "necessary and appropriate to enforce the requirements of this Act,"
including the nondiscrimination mandate. The second sentence of Section 5(b)(2)
goes further, requiring the Secretary—after notice and a hearing, and allowing the
Tribal Council an opportunity to correct any deficiencies—to assume
administration of the Investment Fund if the Secretary determines the Tribe has
materially failed to administer the Investment Fund in accordance with the JFA.

44. On November 4, 1986, the Tribe amended its 1937 Constitution to allow all
descendants of the Saginaw, Swan Creek, and Black River Bands of at least one-quarter degree

10

Indian blood to apply for membership in the Tribe during an eighteen-month open-enrollment period.

45.  By adopting the amendments and accepting the JFA funds, the Tribe obligated itself to abide by the JFA, including the nondiscrimination mandate.

46.  The Tribe understood the JFA to require enrollment of all Band descendants who met the one-quarter degree Indian blood criteria and applied for membership within the eighteen-month open-enrollment period, as reflected in the Tribe's testimony before Congress in the 1980s.

47.  The eighteen-month open-enrollment period began on November 5, 1986, and ended on May 4, 1988. The Tribe received over three thousand applications during the open-enrollment period. Approximately eight hundred of these applicants became enrolled members of the Tribe.

48.  During the open-enrollment period, the Tribe interpreted the amended membership clause to permit the enrollment of all descendants of the Bands, regardless whether they traced to an individual listed on one of the constitutional base rolls lineally or collaterally.

49.  All plaintiffs are among the approximately eight hundred Band descendants who properly applied for membership and became members of the Tribe during the open-enrollment period, or their later-born children. All plaintiffs demonstrated that they qualified for membership under the 1986 Constitution's criteria.

50.  On information and belief, the JFA funds were transferred to the Tribe pursuant to Section 5(a) of the JFA in 1987 and used to establish the Investment Fund.

51.  The Tribe remains legally obligated by the JFA and the 1986 Constitution to

11

administer the Investment Fund in a manner that does not discriminate against Tribe members enrolled during the open-enrollment period. The Secretary remains obligated to enforce the nondiscrimination mandate and, when necessary, to administer the Investment Fund if the Tribe materially fails to administer it in accordance with the JFA.

**1987-1996: Integration of Newly Enrolled Members**

52.  On February 2, 1987, shortly after the Tribe ratified the 1986 amendments, the Tribal Council established Tribal enrollment procedures via the Enrollment Ordinance of the Saginaw Chippewa Indian Tribe of Michigan ("Ordinance 14"). Ordinance 14 contained nothing that would bring plaintiffs' enrollment into question, permitting disenrollment only when a member maintained contemporaneous membership in another tribe.

53.  For nearly ten years after the enrollment of plaintiffs, the Tribe took no action to question or challenge the legitimacy of plaintiffs' membership. During this time, many of the plaintiffs became integrated into the social and cultural life of the Tribe. Like other Tribe members, they attended Tribal events, voted in Tribal elections, and came to depend on the services provided by the Tribe.

**1996-2000: The First Wave of Disenrollment**

54.  In 1996, the Tribal Council amended Ordinance 14 to authorize the disenrollment of members on the basis of "erroneous enrollment." The Tribe then initiated disenrollment proceedings against many members who had been enrolled during the JFA open-enrollment period—including many plaintiffs. These proceedings began an effort to disenroll plaintiffs that spanned nearly two decades.

55.  The Tribe argued that a subset of the members who had been enrolled ten years earlier were erroneously enrolled because their ancestry could not be traced lineally to an

individual who appeared on one of the allotment rolls listed in art. III, § 1(a) of the 1986 Constitution.

56.   The effort to expel members was unsuccessful because the members targeted for expulsion were, in fact, descendants of the historic Saginaw, Swan Creek, and Black River Bands and of at least one-quarter degree Indian blood, and thus satisfied the enrollment criteria spelled out in the membership clause of the 1986 Constitution.

**2000-2011: The Second Wave of Disenrollments**

57.   In 2000, the Tribal Council again amended Ordinance 14, this time purporting to change not only the grounds for disenrollment, but the constitutional requirements for enrollment itself. Ordinance 14, as amended, limited enrollment only to lineal descendants of individuals listed on the constitutional base rolls.

58.   Until the 2000 amendment to Ordinance 14, efforts to expel Tribe members were rare and nearly always unsuccessful. The 2000 amendment opened the door to wholesale expulsion of Tribe members who, like plaintiffs, indisputably met the membership criteria reflected in the 1986 Constitution and contemplated by the JFA.

59.   In 2003, the Tribal Council created the Office of Administrative Hearings ("OAH"). The OAH was authorized to rehear cases in which enrollment decisions had been previously made.

60.   Following the amendment to Ordinance 14 and the establishment of the OAH, hundreds of the Tribe members enrolled during the JFA open-enrollment period had their final enrollment decisions re-opened, and disenrollment proceedings were again brought against those members. Many plaintiffs were among those targeted.

61.   The Tribe ultimately halted the early-2000s disenrollment proceedings against

plaintiffs and reaffirmed their membership in March 2009. After a decision by the Tribal Appellate Court determining that the Tribe had only a "very, very limited implied power" to disenroll a Tribe member based on fraud or mistake, the Tribal Council directed the legal department to dismiss "with prejudice" the then-pending disenrollment cases (the "2009 Directive"), including cases against many plaintiffs.

62.   The Tribal Council confirmed that the 1986 Constitution required the enrollment of collateral descendants of the constitutional base rolls, and that the members targeted for disenrollment in these proceedings traced collaterally to the 1883, 1885, and 1891 constitutional base rolls and were therefore entitled to membership.

### 2011-Present: Mass Disenrollment

63.   In 2011, the Tribal Council once again amended Ordinance 14. The 2011 amendment granted the Tribal Certifier the authority to seek judicial review of all prior determinations by the OAH Hearing Officer finding that a member met the Tribe's membership standards.

64.   This 2011 amendment paved the way for the reopening of decisions which had not yet been dismissed "with prejudice" under the 2009 Directive, and Tribe members who could only trace their heritage collaterally to a constitutional base roll were again targeted for disenrollment.

65.   The Tribe's next step in ratcheting up expulsions was a 2013 decision by the Tribe's Appellate Court, which found that, although it was the practice during the open-enrollment period to enroll members who traced their ancestry collaterally to a constitutional base roll, (1) the practice of enrolling "collateral" descendants was neither "law nor policy," but a "mistake . . . in clear violation of law, then and now," and (2) that the Tribal officials

14

who permitted enrollment based on collateral tracing had been guilty of "gross negligence" because they "should have known the impermissibility of reading collateral descendancy" into the membership clause of the 1986 Constitution. *Kequom v. Atwell/Masterson*, No. 12-CA-1051, at 7 (SCIT Ct. App. Sept. 5, 2013) (emphases in original).

66.   In a series of proceedings before OAH between 2011 and April 2015, the Tribe began to disenroll members who could only trace their heritage collaterally to a constitutional base roll, including those enrolled pursuant to the JFA. The Tribal courts did not acknowledge the obligations imposed on the Tribe by the JFA or the 1986 Constitution.

67.   Building off of its success in disenrolling members, in 2014 the Tribal Council yet again amended Ordinance 14. The 2014 amendment established a procedure to reopen disenrollment cases previously dismissed "with prejudice," including many of plaintiffs' cases.

68.   Plaintiffs challenged the Tribe's authority to reopen final judgments, but were unsuccessful. As a result, plaintiffs were subject to disenrollment proceedings notwithstanding the contrary requirements of the JFA and the 1986 Constitution, and the previous entry of a final judgment holding that they are, in fact, members of the Tribe.

69.   Plaintiffs were disenrolled in proceedings held in 2016 and 2017.

70.   Some plaintiffs had successfully fought disenrollment for decades before finally being disenrolled from the Tribe.

71.   The disenrollment proceedings were conducted in violation of the membership provisions in the Tribe's 1986 Constitution and the JFA.

72.   The Secretary possesses the authority to remedy these unlawful disenrollment proceedings and to restore plaintiffs' membership in the Tribe.

**Effects of Disenrollment**

73. Expulsion from the Tribe stripped plaintiffs of their Tribal membership, health insurance, vital Tribal health care services and providers, per capita payments, educational subsidies, and their Tribal heritage, all of which were previously afforded to them as members of the Tribe.

74. Plaintiff Annette Ott describes her disenrolled and now-deceased father as "a full blood Indian with no tribe." She recounts that her father learned that he had been disenrolled when he went to the Tribal clinic—where he had received medical care for years—only to be told that the clinic could not treat him because he was no longer a member of the Tribe.

75. When her disenrollment case was dismissed "with prejudice," plaintiff Dolly Holzhausen believed that the Tribe "couldn't touch us again." She describes how the loss of medical coverage due to disenrollment in 2016 has made it hard to pay for her prescriptions, and how the loss of her per capita payments has made it difficult to pay the bills: "I don't know how much longer we can survive." She continues: "Disenrollment meant the loss of my whole nationality and my whole family. If I reach out to people I used to be close with, many of them won't talk to me anymore. . . . I have become very depressed as a result, and I've seen a doctor for depression."

**PROCEDURAL HISTORY**

**2016 Petition Submission to the Department of the Interior**

76. On October 19, 2016, plaintiffs submitted a "Request for Assistance Pursuant to the Saginaw Chippewa Indian Tribe of Michigan Distribution of Judgment Funds Act, Pub. L. No. 99-346" ("Petition") to the DOI.

77. The Petition asked the Secretary of the Interior to enforce the JFA by compelling

the Tribe to (1) re-enroll plaintiffs and others who had been unlawfully expelled from the Tribe and (2) cease and desist from its unlawful practice of disenrolling Tribe members who qualify for membership under the JFA and the Tribe's 1986 Constitution.

78.  The Petition made clear that by allowing improper disenrollment to continue, the DOI was failing to carry out its mandatory duty under the JFA. In additional communications with the DOI after to the Petition was submitted, plaintiffs repeatedly urged the DOI to take action. Yet, despite plaintiffs' requests, the DOI did not respond to the Petition.

## Prior District Court Proceeding

79.  To compel the DOI to act on plaintiffs' Petition, on April 16, 2018, plaintiffs filed a Complaint in this Court requesting that the Court enter an order directing defendants to respond to plaintiffs' Petition and to enforce the JFA by halting the unlawful disenrollments and restoring plaintiffs' Tribal membership.

80.  In a Memorandum Opinion dated January 7, 2019, the Court dismissed the Complaint without prejudice on the ground that plaintiffs failed to exhaust their administrative remedies. *Cavazos v. Zinke*, No. 18-891 (CKK), 2019 WL 121210 (D.D.C. Jan. 7, 2019).

## The Bureau of Indian Affairs' Decision

81.  Adhering to this Court's decision, on February 5, 2019, plaintiffs submitted a renewed request for action to the Deputy Director of the BIA pursuant to 25 C.F.R. § 2.8(a). The request asked the Deputy Director to respond to the Petition and to compel the Tribe to stop unlawfully disenrolling members and to re-enroll plaintiffs.

82.  As required by Section 2.8, the request "[s]tate[d] that, unless the [BIA] either takes action on the merits of the written request within 10 days of receipt of such request by the [BIA], or establishes a date by which action will be taken, an appeal shall be filed . . . ."

The BIA failed to take any action within the 10-day deadline set forth in Section 2.8. 25 C.F.R.
§ 2.8(b).

83.   Accordingly, on March 4, 2019, plaintiffs filed a Notice of Appeal to the "next
official in the process" pursuant to 25 C.F.R. §§ 2.8(b), 2.9. And, on April 2, 2019, plaintiffs
filed a Statement of Reasons pursuant to 25 C.F.R. § 2.10.

84.   On April 10, 2019, the DOI's Assistant Secretary for Indian Affairs ("AS-IA")
issued a Scheduling Order requesting briefing from the parties on the matter. The Scheduling
Order set forth deadlines by which certain information needed to be submitted to the AS-IA.

85.   In response, plaintiffs timely filed Supplemental Documentation on April 26,
2019. The documentation included the signed declarations of four disenrolled Tribe members,
highlighting the severe and ongoing harm suffered by each disenrolled member.

86.   Plaintiffs timely filed an Opening Brief on June 12, 2019, and a Response Brief
on July 2, 2019.

87.   Nine months later, on January 30, 2020, the DOI issued a decision authored by the
AS-IA denying plaintiffs' Petition and refusing to take action. The DOI concluded, in relevant
part, that "the [JFA] does not confer on the Secretary authority over Tribal membership and
enrollment." January 30 Decision at 2. This finding is at odds with the JFA.

88.   The Secretary's failure to comply with the mandatory duty to enforce the JFA
constitutes an "unlawfully withheld" action pursuant to the Administrative Procedure Act
("APA"), 5 U.S.C. § 706(1), and the Court should (a) declare that the Secretary unlawfully
failed to enforce the JFA and (b) enjoin defendants to require the Tribe to re-enroll plaintiffs
and restore all of the benefits to which plaintiffs are entitled.

89.   In the alternative, the Court should declare that the DOI's January 30 Decision is

"arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), because it is at odds with the JFA's purpose of protecting all of the Tribe's descendants who meet the requirements set out in the Tribe's 1986 Constitution and with the Secretary's obligations to enforce the JFA's mandates. The Court should also enjoin defendants to require the Tribe to re-enroll plaintiffs and restore all of the benefits to which plaintiffs are entitled.

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF DEFENDANTS' MANDATORY DUTY TO ENFORCE THE**
**JUDGMENT FUNDS ACT**

90.   The allegations contained in paragraphs 1 through 89, above, are repeated and incorporated as though fully set forth herein.

91.   Congress enacted the JFA to settle—once and for all—any outstanding issues regarding membership in the Tribe. Under Section 5(a), Congress allowed the JFA funds to be distributed directly to the Tribe, but only on the condition that the Tribe meet certain requirements set forth in Section 4(a). Among the Section 4(a) mandates is that the Tribe allow for open enrollment for all Band descendants of at least one-quarter degree Indian blood, regardless of whether they descend lineally or collaterally from an allotment roll listed in art. III, § 1(a) of the 1986 Constitution.

92.   The Tribe's enrollment of all applicants who were descendants of the Bands and of at least one-quarter degree Indian blood was a condition precedent to funds being released to the Tribe.

93.   Section 9 of the JFA, the Act's nondiscrimination mandate, provides that "[a]ny distribution or expenditure of the income of the Investment Fund [created to disburse the assets of the JFA funds] . . . shall not discriminate against [] individuals who become members of the

19

tribe after the date on which the amendments to the constitution of the tribe referred to in section 4(a) are adopted and ratified . . . ."

94. All plaintiffs became "members of the tribe after the date on which the amendments to the constitution of the tribe referred to in section 4(a) [we]re adopted and ratified," and thus they are the intended beneficiaries of the nondiscrimination mandate.

95. Section 3 of the JFA requires the Tribal Council to "administer the Investment Fund in accordance with the provisions of this Act," including Sections 4 and 9 of the JFA.

96. To ensure that the Tribe complied with the JFA's requirements, Congress charged the Secretary with authority to enforce the JFA. Section 5(b)(2) of the JFA directs the Secretary to take action that is "necessary and appropriate to enforce the requirements of the [JFA]." Section 5(b)(2) also directs the Secretary to assume administration of the Investment Fund if, after notice and a hearing, "it is determined that the Tribal Council has materially failed to administer the Investment Fund in accordance with the requirements of the [JFA]."

97. By expelling Tribal members who meet the membership criteria set forth in the JFA and the Tribe's 1986 Constitution, "the Tribal Council has materially failed to administer the Investment Fund in accordance" with the JFA, and the JFA therefore requires defendants to enforce the JFA's nondiscrimination mandate.

98. The Tribe initially complied with the JFA's mandates under Sections 4(a) and 9. Plaintiffs are among the approximately eight hundred Band descendants who properly applied for and received membership in the Tribe during the open-enrollment period established by the 1986 Constitutional amendments and referred to in Sections 4(a) and 9(a)(1) of the JFA.

99. The Tribe's unlawful and discriminatory disenrollment of plaintiffs is a clear-cut violation of Sections 3, 4, and 9 of the JFA.

100. By failing to take action in the face of violations by the Tribe, defendants have unlawfully withheld agency action required under the JFA. In light of the Tribe's violations, defendants have a mandatory duty to act pursuant to Section 5(b)(2) of the JFA. The DOI's conclusion that the Secretary "lack[s] legal authority to intervene and grant the [plaintiffs'] requested relief," January 30 Decision at 13, contradicts the JFA's explicit provisions.

101. Defendants' failure to carry out their mandatory duties under the JFA has caused and will continue to cause substantial harm to plaintiffs.

102. The APA, 5 U.S.C. § 706(1), provides that a "reviewing court shall — (1) compel agency action unlawfully withheld or unreasonably delayed."

103. The January 30 Decision constitutes final agency action reviewable by this Court.

104. This Court should enter declaratory and injunctive relief compelling defendants to enforce the nondiscrimination mandate of the JFA by directing the Tribe to reinstate plaintiffs as Tribe members and to restore plaintiffs to the *status quo ante*, including all benefits of Tribal membership that have been withheld from them since their expulsion from the Tribe and accumulated interest.

## SECOND CLAIM FOR RELIEF
### THE SECRETARY'S INTERPRETATION OF THE JFA AS UNENFORCEABLE IS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, AND OTHERWISE NOT IN ACCORDANCE WITH LAW

105. The allegations contained in paragraphs 1 through 104, above, are repeated and incorporated as though fully set forth herein.

106. To ensure that the Tribe complied with the requirements of the JFA, Congress directed the Secretary of the Interior to enforce the JFA. Section 5(b)(2) of the JFA directs the Secretary to take action deemed "necessary and appropriate to enforce the requirements of the [JFA]." Section 5(b)(2) also directs the Secretary to assume administration of the Investment

Fund if, after notice and a hearing, "it is determined that the Tribal Council has materially failed to administer the Investment Fund in accordance with the requirements of the [JFA]."

107. In light of the Tribe's unlawful expulsion of plaintiffs, the Secretary and his designees had the duty and the authority to act pursuant to the JFA. Section 5(b)(2) of the JFA provides the Secretary authority to "enforce the requirements of this Act" when, as here, the Tribe has violated the requirements of the JFA.

108. Defendants' refusal to take action and carry out their duties under the JFA has caused and will continue to cause substantial harm to each plaintiff.

109. The Administrative Procedure Act provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be [] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

110. Pursuant to 25 C.F.R. § 2.20 and 5. U.S.C. § 704, the January 30 Decision constituted a final decision and final agency action reviewable by this Court.

111. The DOI's conclusion that the Secretary "lack[s] legal authority to intervene and grant the [plaintiffs'] requested relief," January 30 Decision at 13, is at odds with the text and purpose of Section 5(b)(2) of the JFA, and thus is "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). DOI's conclusion that it lacks the authority to enforce the nondiscrimination mandate of the JFA should be held "unlawful" and "set aside." *Id.* § 706(2).

112. This Court should set aside the January 30 Decision and remand this matter to the Secretary for further proceedings consistent with the JFA, as construed by this Court.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs respectfully request that the Court enter an Order:

A.    Declaring that defendants have violated the JFA by failing to carry out their duty to enforce the JFA's nondiscrimination mandate, thus permitting the Tribe to disenroll plaintiffs notwithstanding their status under the JFA and the 1986 Constitution as members of the Tribe; and

B.    Declaring that the January 30 Decision is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the JFA; and

C.    Enjoining defendants promptly to take the action authorized by the JFA and directing the Tribe to (1) reinstate plaintiffs and other members disenrolled in violation of the JFA and the 1986 Constitution, and (2) restore to the *status quo ante* each wrongfully disenrolled Tribe member all of the benefits and privileges of Tribal membership that were denied to that member, including, but not limited to, the financial, healthcare, and education benefits accorded to members of the Tribe; and

D.    Awarding plaintiffs their costs and attorney's fees incurred in this action pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and any other applicable fee-shifting statutes; and

E.    Granting plaintiffs any other and further relief that the Court deems just, proper, and appropriate.

/s/ Gerald Torres
Gerald Torres (D.C. Bar No. 965590)
5060 Congress Street
Fairfield, CT 06824
512-423-3629
gerald.torres@yale.edu

/s/ Michael D. Sliger
Michael D. Sliger (N.Y. Bar No. 4662748)
Cornell Law School
Law Offices of Michael D. Sliger, Esq.
1177 Avenue of the Americas, 5th Floor
New York, NY 10036
(810) 394-0072
msliger@mdsligerlaw.com

/s/ David C. Vladeck
David C. Vladeck (D.C. Bar No. 954063)
Rachel Fried (D.C. Bar No. 1029538)
Georgetown University Law Center
Civil Litigation Clinic
600 New Jersey Avenue, NW
Washington, D.C. 20001
(202) 662-9540

*Attorneys for Plaintiffs*

Date: October 14, 2020