**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

JULIA CAVAZOS, *et al.*,

        Plaintiffs,

    v.

DEBRA HAALAND, *et al.*,

        Defendants.

Civil Action No. 20-2942 (CKK)

---

**MEMORANDUM OPINION**
(January 10, 2022)

This administrative law case centers on a U.S. Department of the Interior's ("Interior")

decision ("AS-IA Decision"), after an informal adjudication, to decline to intervene in tribal

disenrollment proceedings by the Saginaw Chippewa Indian Tribe of Michigan ("Tribe").

Plaintiffs are former members of the Tribe who have since been disenrolled by Tribal leadership.

Plaintiffs charge that a federal statute particular to the Tribe, the Judgment Funds Act, PL 99-

346, 100 Stat. 674 (1986) ("JFA"), required Interior to intervene in and put a stop to Tribal

disenrollment proceedings.  In their only claim before the Court, Plaintiffs argue that Interior's

inaction was arbitrary and/or capricious within the meaning of the Administrative Procedures

Act, 5 U.S.C. §§ 500 *et seq.* ("APA").  As a remedy, Plaintiffs seek not just a remand back to the

agency, but an order from this Court mandating Interior's intervention to reverse the Tribe's

disenrollment proceedings.

In support thereof, Plaintiffs focus primarily on statutory provisions in the JFA governing

(1) antidiscrimination against tribal members enrolled after the JFA's enactment and (2)

Interior's supervision of the JFA.   Ultimately, the Court agrees with Interior[1] that the plain

---

[1]  The U.S. Department of the Interior is not, itself, a defendant in this action.  The Federal Defendants
are:  (1) Debra Haaland, in her official capacity as United States Secretary of the Interior; (2) Bryan

meaning of the JFA:  (1) does not classify disenrollment as discrimination and (2) grants Interior broad discretion to intervene in Tribal disputes related to the JFA.  However, the Court holds that Interior incorrectly read the JFA to bar discrimination only against enrolled members of the Tribe.  Because the JFA also bars the Tribe from discriminating against disenrolled members in access to benefits and services funded by the JFA, the Court shall remand the matter to Interior to reconsider whether it should exercise its discretionary authority to intervene in the alleged inequitable provision of such benefits and services.  Accordingly, upon consideration of the pleadings,[2] the relevant legal authorities, and the entire record, the Court **GRANTS IN PART AND DENIES IN PART** Federal Defendants' [29] Cross-Motion for Summary Judgment, **GRANTS IN PART AND DENIES IN PART** Intervenor's [26] Cross-Motion for Summary Judgment, and **GRANTS IN PART AND DENIES IN PART** Plaintiffs' [21] Motion for Summary Judgment.

---

Newland, in his official capacity as Assistant Secretary for Indian Affairs; and (3) Darryl Lacounte, in his official capacity as Director of the Bureau of Indian Affairs.  Additionally, the Tribe has intervened as Intervenor-Defendant.

[2]  The Court's analysis has focused on the following documents:
- Plaintiffs' Motion for Summary Judgment ("Pls.' Mot."), ECF No. 21;
- Federal Defendants' Cross-Mot for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment ("Defs.' Cross-Mot"), ECF No. 29;
- Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment and in Further Support of Plaintiffs' Motion for Summary Judgment ("Pls.' Repl.")
- Reply Brief of Intervenor-Defendant ("Tribe Br."), ECF No. 38; and
- Federal Defendants' Reply in Support of their Cross-Motion for Summary Judgment ("Defs.' Repl."), ECF No. 39.

The Court did not find consideration of Plaintiffs' [46] Surreply necessary or helpful in the resolution of this matter.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

# I.    BACKGROUND

## A.  Factual and Statutory Background

The heart of this case is a dispute over tribal disenrollment, i.e., who qualifies as a member of the Tribe.  Although the Tribe is one legal entity today, historically it was a collection of many tribes throughout what is now the State of Michigan.  AR-000710-11.  Like many other tribes, these tribes agreed to cede much of their land to the United States during the early part of the 19th century.  AR-0001845.  A reservation system followed, and the federal government set out to allot several plots of land to individual Tribal members and the Tribe itself during the latter part of the 19th century.  *Id.*  To assist in the distribution of property, the federal government prepared "allotment rolls," listing, at various times, distinct but mostly overlapping counts of Tribal members.  *See* AR-001301-05.  This effort was mostly unsuccessful, however, and "the federal government largely mishandled, or ignored, its part of the bargain" to distribute reservation lands in accordance with its legal obligations.  *See Saginaw Chippewa Indian Tribe of Mich. v. Granholm*, 690 F. Supp. 2d 622, 628 (E.D. Mich. 2010).

After the Tribe's federal recognition in 1934, the disaster in reservation allotment created, in essence, two classes of Tribal members.  Although the Tribe's draft constitution classified as members "[a]ll persons of Indian blood belonging to" to the tribal forebears of the Tribe, AR-001310, the federal government insisted that the Tribe's constitution instead extend membership only to those who resided on reservation lands, AR-001312.  From 1937 onwards, this change in tribal membership has divided those lineal and collateral descendants.

The 1973 Indian Judgment Funds Distribution Act, codified at 25 U.S.C. § 1403, provided non-reservation Tribal descendants an opportunity to lobby the federal government for assistance in Tribal recognition and membership.  This statute further effected four money

judgments issued in favor of the Tribe's tribal forbears as compensation for historical land theft by the federal government.  *See* AR-000710.  In 1976, the Bureau of Indian Affairs ("BIA") and Congress elected to equally distribute on a per capita basis one of those judgments to all descendants of the Tribes, regardless of whether they were enrolled members of the tribe.  AR-000713-14, 722.  Before the distribution of the three remaining judgments, the Tribe lobbied Congress to prevent the funds' distribution to unenrolled tribal descendants.  AR-000572.

Initially, the Tribe's lobbying efforts were successful.  In 1984, one Michigan Senator introduced a bill to name the Tribe as the sole beneficiary of the undistributed funds.  AR-000725.  BIA again opposed this effort and recommended to Congress that the unenrolled descendants receive an equitable portion of those funds.  AR-000830-31.  The BIA was silent, however, on whether unenrolled descendants should be enrolled in the Tribe.  Congress instead struck a compromise—conditioning the release of the remaining funds on the Tribe adopting "a constitutional provision or ordinance which would enable a person who meets the existing . . . blood quantum for membership to become an enrolled member of the tribe" regardless of reservation residency.  S. Rep. No. 98-609, AR000881-82 (Sept. 18, 1984).

That compromise is expressed in the legislation Congress ultimately passed, the JFA.  For present purposes, there are three key provisions of the JFA:  (1) the Enrollment Provision,  (2) the Nondiscrimination Provision, and (3) the Enforcement Provision.  The Enrollment Provision works across two statutory sections.  First, in section 5, it conditions the release of funds upon a constitutional amendment permitting the enrollment of collateral descendants:

> The Secretary [of the Interior] shall transfer the funds . . . after the date on which the Secretary receives written notice of the adoption by the Tribal Council . . . if the amendments to the constitution of the [T]ribe referred to in section 4(a) are adopted and ratified[.]

JFA § 5(a).  Next, section 4(a) defines that amendment as "any amendments to the constitution of the [T]ribe which were approved by the Tribal Council on April 15, 1985, in resolution L and O-03-85."  Although that amendment does not appear to be in the administrative record before this Court, the parties evidently agree that resolution L and O-03-85 broadened tribal membership from lineal (predominantly resident) descendants to

> [a]ll descendants of person[s] whose names appear on any [allotment rolls] who are at least one-quarter degree [Tribal] blood born prior to or within one year of the effective date of approval of this Amended Constitution by the Secretary of the Interior, provided that such descendants duly apply for membership within the Saginaw Chippewa Indian Tribe of Michigan within 18 months of the effective date of the amended Constitution.

Constitution of the Saginaw Chippewa Indian Tribe of Michigan § 1(d), AR-00098.  Altogether, the Enrollment Provision conditions the release of funds upon the adoption of this provision.

The Nondiscrimination Provision bars the tribe from discriminating against Tribal members enrolled pursuant to section 1(d) in the provision of Tribal benefits and services funded by the proceeds of the money judgments.

> (a) Any distribution or expenditure of the Investment Fund [created with funds], and any program or activity fund, in whole or in part, by the principal or income of the Investment fund, shall not discriminate against—
>   (1) Individuals who become members of the tribe after the date on which [section 1(d) is adopted] . . . or
>   (2) Members of the tribe who do not reside on the reservation of the tribe
> (a) Any —
>   (1) Expenditure for any improvement on the reservation of the tribe, or
>   (2) Program or activity conducted only on the reservation of the tribe in which any member of the tribe can participate, shall not be construed to be discriminatory for purposes of subsection (a) merely because the benefits of such improvement, program, or activity are more readily available to members of the tribe who reside on the reservation of the tribe

JFA § (9).

Finally, the Enforcement Provision empowers the Secretary of the Interior to enforce the provisions of the JFA.

> The Secretary may take such action as the Secretary may determine to be necessary and appropriate to enforce the requirements of this Act. After notice and hearing, the Secretary may take such action as the Secretary may determine to be necessary and appropriate to assume administration of the Investment Fund fi it is determined that the Tribal Council has materially failed to administer the Investment Fund in accordance with the requirements of this Act. The Secretary shall provide whatever assistance may be necessary to the Tribal Council to correct any such deficiencies prior to the proposed Secretarial assumption of the administration of the Investment Fund . . . .

JFA § (5)(b)(2).

The Tribe passed the constitutional amendment broadening membership to nonresident Tribal descendants and, as a result, subsequently received the funds delineated in the JFA. *See* AR-001850-51. After 1986, the Tribe began to enroll nonresident Tribal members pursuant to the statutory enrollment period. AR-000068. Out of 3,000 applications from nonresident descendants, the Tribe enrolled around 800 new nonresident members between 1986 and 1996. Intervenor's Ans. at ¶ 49, ECF No. 23.[3]

In 1996, the Tribe began several efforts to disenroll nonresident members. In 1996, the Tribe passed an ordinance permitting the Tribe to disenroll members for submitting "deficient, erroneous, or fraudulent evidence" to enroll. AR-000128-29. In 2000, the Tribe passed an ordinance explicitly limiting membership to lineal descendants. *See* AR-000153-54. Then, in 2013, the Tribe's court of last resort on matters of tribal law held that the tribal constitution's phrase "[a]ll descendants"—as amended pursuant to the JFA—meant only lineal descendants. AR-000140. With that ruling in hand, the Tribe disenrolled hundreds of members, including members enrolled pursuant to the JFA. Intervenor's Ans. at ¶¶ 2, 69; AR-001361-70.

### B. Procedural Background and Administrative Decision

---

[3] Neither Plaintiffs nor the Federal Defendants contest this figure. Pl.'s Mot. at 12; Defs.' Cross-Mot at 6.

Some, if not all, Plaintiffs then sued in a variety of fora to stop disenrollment.  Relevant

to this APA challenge, Plaintiffs first asked for BIA's intervention in July 2015.  AR-001853.

After subsequent meetings between BIA officials and Plaintiffs in 2016 and 2017, BIA took no

action on Plaintiffs' request.  AR-001853-54.  Plaintiffs then filed suit before this Court seeking

mandamus relief.  *See Cavazos v. Zinke*, No. 18-cv-0891, 2019 WL 121210 (D.D.C. Jan. 7,

2019).  Because Plaintiffs had not yet appealed their request for assistance to the Assistant

Secretary for Indian Affairs pursuant to 25 C.F.R. §§ 2.8-2.9, the Court dismissed Plaintiffs'

complaint for failure to exhaust administrative remedies.  *Id.* at *7.

In February 2019, Plaintiffs returned to Interior by filing a renewed request for assistance

with the Deputy Director of the Bureau of Indian Affairs for Field Operations.  AR-001854.

Having yet to receive a response from the Deputy Director, Plaintiffs filed an appeal with the

AS-IA on March 4, 2019.  *Id.*  The AS-IA directed Plaintiffs and the Tribe to brief the following

questions:

1. Did the [JFA] mandate the specific Plaintiffs' enrollment in the Tribe?
2. Does the [JFA] vest Interior with either mandatory or discretionary authority to either protect the [Plaintiffs] from disenrollment from the Tribe or order [Plaintiffs] re-enrollment in the Tribe (as applicable)?
3. If the Act only vests the Secretary with discretionary authority, what legal and equitable factors should the Secretary consider when deciding whether to exercise that authority?
4. Did the Tribe's disenrollment process deny [Plaintiffs'] due process and/or equal protection under the law?

As here, Plaintiffs spent much of their briefing on the JFA's legislative history and the history of

Tribal membership.  The AS-IA considered that legislative history and rejected that it meant that

the JFA barred disenrollment of nonresident Tribal members and, even if so, that Interior was

statutorily bound to intervene.  Rather, it determined that the statutory meaning was plain or, in

the alternative, that the legislative history instead supported Interior's reading of the JFA.

7

The AS-IA decision reasoned that the JFA *permits*—but does not require—Interior's intervention only where a requirement of the JFA has been violated.  AR-001856-57.  It further concluded that, because the Nondiscrimination Provision does not discuss enrollment and there is no other provision requiring Plaintiffs' ongoing enrollment, disenrollment is not a violation of the JFA's requirements.  AR-001860-61.  In other words, "[n]either the plain language nor legislative history of the Act reflect congressional intent to mandate the perpetual enrollment of any individuals in the Tribe."  AR-001859.  Finding no authority to intervene, the AS-IA denied Plaintiffs' request.  AR-001863.  At that point, having exhausted their administrative remedies, Plaintiffs filed suit again this Court.  After the Court permitted the Tribe's intervention in this case, the parties completed their summary judgment briefing.  The Court now turns to the briefing's resolution.

## II.     LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  However, "when a party seeks review of agency action under the APA [before a district court], the district judge sits as an appellate tribunal.  The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1083 (D.C. Cir. 2001).  Accordingly, "the standard set forth in Rule 56[ ] does not apply because of the limited role of a court in reviewing the administrative record . . . .  Summary judgment is [ ] the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Southeast Conference v. Vilsack,* 684 F. Supp. 2d 135, 142 (D.D.C. 2010).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 513 (2009).  It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  "This is a 'narrow' standard of review as courts defer to the agency's expertise." *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 138 (D.D.C. 2012) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)).  As the "focal point" in administrative review, the Court's inquiry is limited to the administrative record before it. *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  Absent special circumstances, the Court is not to consider evidence outside the record or arguments not raised before the agency. *See Am. Bottling Co. v. NLRB*, 992 F.3d 1129, 1139 (D.C. Cir. 2021).

### III.    DISCUSSION

#### A.  Agency Review and Scope of Remand

As a general matter, the APA permits the Court only to "hold unlawful and set aside agency action" that it determines to be invalid. 5 U.S.C. § 706(2).  Only in "exceptional situation[s]" involving "crystal-clear administrative error" may a Court order specific relief. *NLRB v. Food Store Empls. Union, Local 347*, 417 U.S. 1, 8 (1974); *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005).  "Under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency[.]"  *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995) (Silberman, J.).

Plaintiffs point to *Cherokee Nation v. Nash*, 267 F. Supp. 3d 86 (D.D.C. 2017) as a purported exception to the statutory rule.  Pls.' Mot. at 43.  The Federal Defendants correctly note that *Nash* is distinguishable insofar as summary judgment was granted against the Cherokee Nation, not the federal government.  Defs.' Cross-Mot. at 35 (citing 267 F. Supp. 3d at 140).  The two cases are distinguishable for an even more fundamental reason however—*Nash* was not an APA case.  The Cherokee Nation's claim for declaratory relief was predicated upon an 1866 treaty between the United States and the Cherokee Nation, not upon unlawful agency action. 267 F. Supp. 3d at 91.  As the case has no bearing on administrative law, and seeing no other authority permitting the Court to stray from the statutory rule, the Court concludes at the outset that the only relief it may grant to Plaintiffs is a remand to Interior for further proceedings.

#### B.  Reviewability of Discretionary Agency Action

Defendants argue that the discretionary language of the Enforcement Provision makes the AS-IA Decision "an agency action [] committed to agency discretion by law," presumptively

unreviewable by the Court.  Defs.' Cross-Mot at 30 (quoting 5 U.S.C. § 701(a)(2)).  Defendants

correctly note that "agency decisions not to institute enforcement proceedings" are generally

outside the bounds of APA review.  *Citizens for Resp. & Ethics v. FEC*, 892 F.3d 434, 439 (D.C.

Cir. 2018).  However, "an agency's announcement of its interpretation of a statute, even when

that interpretation is advanced in the context of a decision not to take enforcement action," *is*

reviewable.  *Edison Elec. Inst. v. EPA*, 996 F.2d 326, 333 (D.C. Cir. 1993).  This is so because

they "'are more likely to be direct interpretations of the commands of the substantive statute

rather than the sort of intermingled assessments of facts, policy, and law that drive an individual

enforcement action.'"  *NAACP v. Trump*, 298 F. Supp. 3d 209, 228 (D.D.C. 2018) (quoting

*Crowley Caribbean Trans., Inc. v. Penia*, 37 F.3d 671, 677 (D.C. Cir. 1994)).  The issues here are

twofold:  (1) whether disenrollment is a violation of one of the JFA's provisions, and (2) if so,

whether Interior was *required* to intervene.  These questions go precisely to agency authority and

statutory interpretation, not to discretionary enforcement.  As such, the Court concludes that the

AS-IA Decision is reviewable, at least as to these questions, under the APA.

### C.  The JFA and Statutory Interpretation

To the extent this case is about federal law at all, it centers on the statutory interpretation

of the JFA.  To evaluate Plaintiffs' claim that Interior misread the relevant provisions of the JFA,

the Court must first apply "the ordinary tools of statutory construction" to determine "whether

Congress has directly spoken to the precise question at issue."  *Chevron U.S.A., Inc. v. NRDC*,

467 U.S. 837 (1984).  "If the intent of Congress is clear, that is the end of the matter; for the

court, as well as the agency, must give effect to the unambiguously expressed intent of

Congress."  *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 296 (2013) (quoting *Chevron*, 467 U.S.

at 842-43).  As with all statutory interpretation, the Court "will not resort to legislative history to

cloud a statutory text that is clear." *Citizens for Resp. & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1018 (D.C. Cir. 2018).

If, however, "the statute is silent or ambiguous with respect to the specific issue," the Court must determine what deference to give to the agency's interpretation.  To merit *Chevron* deference, the agency must show that Congress "has delegated authority to the agency to make rules carrying the force of law," "the agency interpretation claiming deference was promulgated in the exercise of that authority," and that it was promulgated after "relatively formal administrative procedures that tend to foster the fairness and deliberation that should underlie a pronouncement of legal interpretation."  *Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1136 (D.C. Cir. 2014) (cleaned up) (citing *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)).  If the agency's interpretation was not issued pursuant to these three requirements, it may nevertheless be due lesser deference insofar as it has the "'power to persuade.'"  *Fox v. Clinton*, 684 F.3d 67, 76 (D.C. Cir. 2012) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  The parties disagree over what deference Interior's interpretation is due.

Plaintiffs insist that that Interior's interpretation is due no deference whatsoever, including *Skidmore* deference.   The Federal Defendants maintain that *Chevron* deference applies.  Defs.' Cross-Mot at 20.  Whether, and under what circumstances, an interpretation reached in an informal adjudication is entitled to *Chevron* deference is still a murky question in this Circuit.  In *Mead*, the Supreme Court left unanswered whether, and under what circumstances, *Chevron* deference applies to informal adjudications.  *See* 533 U.S. at 243 (Scalia, J., dissenting).  This Circuit extends *Chevron* deference to an informal adjudication where the informal adjudication was "intended to have general applicability and the force of

law." *Kaufman v. Nielsen*, 896 F.3d 475, 484 (D.C. Cir. 2018); *see also Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 331 (D.C. Cir. 2011) (extending *Chevron* deference to Coast Guard statutory interpretation where court on remand ordered Coast Guard to directly answer ambiguous question of statutory interpretation).  Additionally, the Circuit looks to "'the interstitial nature of the legal question, the related expertise of the Agency, the importance of question to the administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time." *Kaufman*, 896 F.3d at 484 (quoting *Barnhart v. Walton*, 535 U.S. 212, 222 (2002)).  The Court concludes that, if there were some ambiguity in the relevant statutory provisions here, Interior's interpretation would be due *Chevron* deference.

To begin, the Court turns to the *Fogo de Chao* factors.  First, the statute here delegates exclusive authority to Interior to make rules regarding its execution.  The JFA empowers the Secretary of the Interior to "take such action as the Secretary may determine to be necessary and appropriate to enforce the requirements of the Act."  JFA § 5(b)(2).  The provision permits the Secretary to issue orders, whether through informal or formal means, to enforce (and thereby further define) the JFA.  Second, Interior's interpretation was promulgated here in response to a request for it to intervene pursuant to the JFA's terms.  Third, the AS-IA employed relatively formal procedures to arrive at his decision.  The AS-IA ordered a briefing schedule and considered a lengthy record that both Plaintiffs and the Tribe submitted for the AS-IA's review.  The decision itself is written like a court decision and is fairly legalistic in its presentation.  As such, the Court concludes that Interior's informal adjudication here meets the *Fogo de Chao* factors.

Similarly, the decision has applicability over the entire population affected by the JFA and, in answering several legal questions over the scope of the JFA, must have been intended to carry the force of law.  Although the JFA itself may not be as complicated or impactful as other statutes that Interior administers, it is squarely within Interior's expertise in tribal matters.  Who precisely benefits from the fund created by the JFA is also, the Court concludes, central to the statute itself.  Additionally, as Plaintiffs argue, BIA has considered the scope of the JFA since its inception in 1986.  On these facts, the Court finds that this informal adjudication is due *Chevron* deference.

Indeed, the facts in this case are quite similar to those in *Forest Cty. Potawatomi Cmty. v. United States*, 330 F. Supp. 3d 269 (D.D.C. 2018) (CKK).  In that case, this Court confronted an informal adjudication in which the AS-IA decided not to approve an amendment to a gaming compact between a tribe and the State of Wisconsin.  *Id.* at 278.  Approval turned on the meaning of a particular clause in the Indian Gaming Regulatory Act.  *Id.* at 279.  This Court held that Interior's interpretation was due *Chevron* deference because the AS-IA:  (1) "consider[ed] the arguments of the parties, submissions of interested stakeholders, past Decisions, and the intent of Congress[;]" (2) ordered the same relatively formal briefing as here, and (3) intended its decision to have precedential effect.  *Id.* at 282.  As such, even if the JFA were ambiguous—it is not— Interior's interpretation would be due *Chevron* deference.

    1.   Enrollment Provision

In their opening brief, Plaintiffs read the Enrollment Provision to require continued enrollment of collateral descendants.  Pls.' Mot. at 23.[4]  The Enrollment Provision entitles the Tribe to the three remaining judgment funds if it passes an amendment to its constitution extending membership to "[a]ll descendants of persons whose names appear on [the various allotment] rolls . . . who are at least one-quarter degree Indian blood born."  AR-001851.  It goes on to explicitly permit the Tribe to pass *any* subsequent amendment provided that such an amendment "may not be adopted before the date that is 18 months after" the triggering amendment is adopted.  JFA § 4(b).  The Enrollment Provision, then, has *no* bar on subsequent disenrollment of nonresident descendants; in fact, it permits it.  Like the AS-IA, the Court does not see any term imposing any permanent prohibition on constitutional amendments—or any other tribal law—affecting membership in enrollment.

Similarly, the plain language of section 5 imposes no bar on subsequent membership changes.  It merely provides that *if* "the amendments to the constitution of the tribe referred to in section 4(a) are adopted," *then* "[t]he Secretary shall transfer the funds . . . to the Tribal Council."  JFA § 5(a).  Section 5 does not have any clause that prohibits the Tribe from making subsequent membership changes.  Nor does it have a clause that merely rescinds the funds or otherwise punishes the Tribe for subsequent membership changes.  As the AS-IA found, "[s]ection 5(a) conditions the transfer of funds merely upon the Tribe's *ratification* of the constitutional amendments [in 4(a)], not upon the *enrollment* of any individuals or a particular interpretation of the Tribe's membership criteria."  AR-001857 (emphasis original).  Whatever Plaintiffs'

---

[4]  "Nothing in the JFA suggests that membership could be time-limited or conditional."  In their reply, Plaintiffs insist that they do not, in fact, argue for "perpetual enrollment" of nonresident descendants, but rather that the Tribe cannot disenroll nonresident descendants *because of* their nonresident status.  Pls.' Repl. at 16-17.  For present purposes, this strikes the Court as a distinction without a difference.

understanding of the legislative history and public-regarding purpose of the JFA, the plain meaning of the statutory language in the Enrollment Provision forecloses Plaintiffs' reading.

### 2. Nondiscrimination Provision

Both Plaintiffs and the Federal Defendants, however, misread the plain language of the Nondiscrimination Provision.  Plaintiffs insist that disenrollment is *itself* discrimination within the meaning of the provision.  The Federal Defendants, on the other hand, argue that the Nondiscrimination Provision bars discrimination against only current members of the Tribe. Both readings are incorrect.

The Nondiscrimination Provision bars the Tribe from discriminating against "individuals who become members of the tribe after the date of [the membership] amendment[]" and "members of the tribe who do not reside in the reservation of the tribe" in the "distribution" and access to "any program or activity funded, in whole or in part, by the principal or income of the Investment Fund."  JFA § 9.  As such, the class of people protected by this provision is "individuals who become members of the tribe after the date on which the [enrollment] amendments" are ratified.  JFA § 9(a)(1).  The services and benefits to which that class must have equal access are those "program[s] or activit[ies] funded, in whole or in part, by the principal or income of the Investment Fund."  *Id.* § 9(a).  Taken together, this federal law guarantees equal access to Tribal benefits and services funded by the Investment Fund to anyone who was *once* a member who enrolled *after* the constitutional amendment that broadened tribal membership to "[a]ll descendants."  The AS-IA Decision was correct that the Nondiscrimination Provision covers "members of the tribe who do not reside on the reservation of the tribe," AR-001859 (quoting JFA § 9(a)(2)), but it *also* covers individuals who, by the plain language of the

statute, may or may not be presently enrolled members of the Tribe.[5]  As such, the Court agrees, in part, with Plaintiffs that "Congress, in taking pains to protect 'individuals' who were enrolled pursuant to the JFA, made clear that the Tribe could not elude Section 9 . . . ."  Pls. Br. at 33. That cuts *against* Plaintiffs' reading, however, as the statutory language anticipates that nonresident members may be disenrolled at some future date.

Ultimately, Interior's misreading necessitates only a minor remand.  Plaintiffs, after all, seek *only* their re-enrollment as a remedy, and not an order requiring continued, equal access to Tribal services funded by the JFA funds.  That said, because, as the Court shall next discuss, Interior's erroneous reading of the statute informed their decision to decline to exercise their discretionary authority to enforce the provisions of the Nondiscrimination Mandate, a remand is necessary to afford Interior the opportunity to reconsider its decision in light of the correct reading of the statute.

### 3.  Enforcement Provision

In fact, a remand may end up a as moot point, because the Enforcement Provision extends Interior broad discretion to intervene in Tribal disputes centered on the JFA.  Pursuant to the Enforcement Provision,

---

[5]  The Federal Defendants briefly contest this reading in their briefing, writing, "the mere use of the word [']individuals['] in this context does not indicate that the Funds Act charges Interior with guaranteeing the membership status of all individuals enrolled pursuant to the Funds Act for all-time."  Defs.' Cross-Mot. at 17.  Strictly speaking, the Court agrees.  The word "individuals" guarantees equal access to benefits and services funded by the Investment Act for all time, not enrollment (i.e., membership).  To the extent that the Federal Defendants meant to argue, by this single sentence, that the Nondiscrimination Provision covers only members of the Tribe notwithstanding the word "individuals," the Court must remand the point to Interior as Interior did not appear to consider this reading in its Decision.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943); *see also generally The Constitutional Foundations of* Chenery, 116 Yale L.J. 952 (2007) (explaining why a court cannot accept an agency's *ex post facto* justifications for agency action).

> [t]he Secretary [of the Interior] may take such action as the Secretary *may* determine to
> be necessary and appropriate to enforcement the requirements of this Act.  After notice
> and hearing the Secretary *may* take such action as the Secretary *may* determine to be
> necessary and appropriate to assume administration of the Investment Fund if it is
> determined that the Tribal Council has materially failed to administer the Investment
> Fund in accordance with the requirements of this Act.

JFA § 5(b)(2) (emphasis added).  Relying heavily on legislative history, Plaintiffs argue that
"may" actually means "shall."  Not so.  The plain language of this provision extends only
permissive authority to Interior to enforce the requirements of the JFA.  This provision's use of
"may" stands in stark contrast to other instances of the word "shall," included in the
Nondiscrimination Provision.  Another instance of the word "shall," later in subsection 5(b)(2),
provides that Interior "shall provide whatever assistance may be necessary" to the Tribe before
exercising its discretionary authority to intervene. "[A] reading of the provision as a whole—
especially the repeated use of the word 'may' rather than 'shall'" means Interior's authority to
intervene here is purely discretionary. *See Ala. Power v. FERC*, 160 F.3d 7, 11 (D.C. Cir. 1998);
*see also Anglers Cons. Network v. Pritzker*, 809 F.3d 664, 671 (D.C. Cir. 2016) (making similar
distinction between "may" and "shall").

The Enforcement Provision is also noticeably bare of any reference to tribal enrollment.
In fact, the Enforcement Provision only mentions specifically "administration of the Investment
Fund."  As the Court discusses in Part II.B.4, this language suggests that Congress was primarily
focused on the proper provision of the appropriated funds, not on enrollment disputes.  The
Court sees no statutory language permitting it to read into the JFA terms that are not already
there.  *See Little Sisters of the Poor Stains Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367,
2381 (2020) (explaining that a court should not add "limits on an agency's discretion that are not
supported by the text"). In any event, the AS-IA Decision appropriately concluded that this
permissive language did not require, or even counsel, Interior's "intrusion in tribal self-

governance." AR-001855.  As such, the Court concludes that the plain language of the Enforcement Provision neither makes perpetual enrollment a requirement of the JFA nor requires Interior's intervention in this case.

4.   Ambiguity and Legislative History

Alternatively, even if there were some ambiguity, the Court concludes that the legislative history does not permit a reading of the JFA that requires Plaintiffs' continued enrollment in the Tribe.  The legislative history explains that Congress was primarily concerned with the use of its appropriated funds, not with Tribal membership decisions.  Plaintiffs rely heavily on testimony from Tribal Council leadership who purportedly assured collateral descendants and Congress that collateral descendants would have guaranteed membership.  As an initial matter, what the *Tribe* may have promised may nevertheless be distinct from what *Congress* enshrined as federal law. In any event, Tribal Council leadership made no such promise; their testimony was that "[a]ll descendants of at least one-quarter degree Indian blood will have the *opportunity* to *apply* for membership."  AR-001858 (emphasis altered).  Similarly, the March 20, 1986 Committee Report notes that the bill as amended "provides that the funds will not be transferred to the tribe unless the tribe agrees to make all [collateral] descendants . . . *eligible* for membership."  AR-000916 (emphasis added).

The Committee Report goes on to demonstrate that Congress' main concern was the distribution of the funds, not enrollment itself.  The Committee explains "there is no reason to continue to issue per capita shares to individuals who, even though they may be descendants of an Indian ancestor" are nevertheless not eligible for membership in the Tribe.  *See* AR-000916. In other words, Congress saw enrollment as a vehicle to accomplish the law's goal of equitable distribution of judgment funds.   Enrollment itself was not the true goal of the legislation.  This

legislative history explains why the JFA vested Interior with the discretionary authority to intervene only in the "administration of the Investment Fund" and not in enrollment decisions. *See* JFA § 5(b)(2).

This reading also squares best with BIA's concerns with earlier versions of the legislation. On August 6, 1984, BIA leadership testified that it was concerned that an early draft of the bill did not equally "divide[] [the funds] between the Saginaw Chippewa Tribe of Michigan and the Saginaw Chippewa descendants." AR-000826.   To be acceptable to BIA, the legislation would have to address "almost 80 percent of the proposed beneficiaries [unenrolled descendants] as well as . . . [provide] the Secretary of the Interior[] responsibility for carrying out the trust." AR-000827.   BIA did not, however, say that the legislation would have to secure membership for unenrolled descendants or vest Interior with any authority to require continued enrollment.   Even testimony from collateral descendants themselves shows that their concern was more with the equitable distribution of federal funds than tribal membership.   For example, Karen Sherwood's testimony, as "a descendant of the Saginaw," made no mention of enrollment, but did insist that Congress's "responsibility [was to] see that the *descendants* are *paid*." AR-000658 (emphasis added).

Plaintiffs' strongest point in the legislative history comes from the statement of a co-sponsor during debate on the House floor.   Rep. Schuette insisted that, as to the Enrollment Provision, "[d]escendants feared that once membership was opened to those with 25 percent Saginaw-Chippewa blood quantum, the constitution could be amended once more to disenfranchise these new members.   With this provision, the descendants' rights and the descendants' privileges are fully protected." AR-000940.   During the same debate, however, other Members were primarily concerned with the provision of funds, not membership.   Rep.

Traxler asked Rep. Schuette "[e]verything that the tribal Indian would be entitled to under the trust funds, then we can safely say that off-reservation, the *descendant* Indian, would also be eligible for[?]" *Id.* (emphasis added).  That Rep. Schuette responded that enrollment ensured equal access spoke to how this Court reads the statute to function, i.e., that enrollment is one vehicle to equal access to JFA funds.  In any event, the Court is inclined to defer to Interior's interpretation, that the legislative history does not "reflect congressional intent to mandate the perpetual enrollment of any individuals in the Tribe," AR-001859, as reasonable, *Chem. Mfrs. Ass'n v. EPA*, 217 F.3d 861, 866 (D.C. Cir. 2000) (holding that *Chevron* affords deference to any agency interpretation of an ambiguous statute so long as it is reasonable).

Nor does the legislative history support a conclusion that Congress intended Interior to have any duty—discretionary or mandatory—to ensure the continued enrollment of collateral descendants.  At the outset, the Court starts with a presumption that, were the statute ambiguous, ambiguity should be resolved in favor of tribal sovereignty.  *See Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1445 (D.C. Cir. 1988) ("The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians." (cleaned up) (quoting *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 765 (1985))).  Congress generally "desire[s] not to intrude needlessly on tribal self-government," and, historically, did not during the time the JFA was enacted.  *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 71 (1978); *see also White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143 (1980).

Plaintiffs rely primarily on a February 28, 1986 letter Interior sent to Congress supporting the JFA as amended.  Plaintiffs maintain that Interior was "particularly persuaded" by the new Nondiscrimination Provision and understood it to "'require secretarial intervention.'"  Pls. Br. at

12 (quoting AR-000921)).  That is not what the letter said.  Interior wrote, "[w]e interpret [the Nondiscrimination Provision] to require secretarial intervention only on the receipt of verified information that the tribal council failed to administer the Investment Fund in accordance with the bill."  AR-000921.  In other words, failure to properly administer the Fund set up a necessary, but not sufficient, condition for Interior's intervention.  In fact, Interior viewed its authority as quite limited.  It understood the JFA to release Interior from "further trust responsibility for the investment, supervision, administration, or expenditure of the principal or income of the fund" upon "the completion of the transfer [of funds] to the tribal council for deposit in the Investment Fund."  *Id.*  Seeing no other legislative history supporting mandatory Secretarial intervention, the Court agrees with Interior's reasonable reading that the Enforcement Provision is discretionary.[6]

### D.  Purported Change in Agency Position

Plaintiffs next argue that BIA "changed its understanding of the JFA."  Pls.' Br. at 41. Plaintiffs correctly note that an agency's failure to "offer a reasoned explanation . . . for disregarding facts and circumstances that underlay . . . the prior policy" is its own basis for remand.  *See United Steel v. MHSA*, 925 F.3d 1279, 1284 (D.C. Cir. 2019) (internal quotation marks removed).  "'It is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review.'" *New LifeCare Hosps. of N.C. LLC v. Azar*, 466 F. Supp. 3d 124, 135 (D.D.C. 2020) (TNF) (emphasis omitted) (quoting *Wallaesa v. FAA*, 825 F.3d 1071, 1078 (D.C. Cir. 2016)).  The degree to which Plaintiffs articulated BIA's prior position in its briefing before the agency is

---

[6]  In other words, were the statute ambiguous, the Court would defer to Interior's interpretations of the Enforcement Provision and Enrollment Provision as reasonable.  The Court would not defer to Interior's reading of the Nondiscrimination Provision insofar as it views it as applicable only to presently-enrolled Tribal members.

questionable.  Plaintiffs' request for BIA's assistance, submitted October 16, 2016, included an affidavit that, in one sentence, alleged that "the BIA instructed [Tribal enrollment staff] that any applicant for membership who had been certified as eligible to participate in Docket 57 and who was of at least one-quarter blood Indian must be enrolled if they applied for Tribal Membership during open enrollment [in 1986 and 1987]."  AR-00010.  Plaintiffs never articulated this allegation as a general claim that BIA had previously determined (1) that the JFA guarantees perpetual enrollment of collateral or (2) that BIA has a mandatory duty to ensure their perpetual enrollment.  To the extent that such an argument was raised in its October 2016 briefing, Plaintiffs nevertheless failed to preserve it in its briefing before the AS-IA.

Even had this argument been preserved, it fails.  First, as a practical matter, the regional staff's purported guidance speaks only to who "must be enrolled," not whether the JFA requires perpetual enrollment or whether BIA has a mandatory duty to ensure their perpetual enrollment.  Second, Plaintiffs in their October 2016 request characterize BIA's early purported position as "informal advice and training" from "Agency staff" based at the "Michigan Agency in Sault Ste. Marie."  AR-00039-40.  Pursuant to 25 C.F.R. § 61.11(c), 50 Fed. Reg. 46430 (Nov. 8, 1985), only the "[Regional] Director or Superintendent" may determine tribal enrollment eligibility. There is no evidence here that any Regional Director or Superintendent promulgated any guidance on eligibility as to the Tribe nor any evidence that the unnamed staff had such authority. As such, it is not at all clear that the unnamed staff had the authority to make any "prior policy" from which BIA might have deviated.  *See Ctr. for Auto Safety v. Nat. Highway Traffic Safety Admin.*, 452 F.3d 798, 810 (D.C. Cir. 2006) (explaining that agency could not have adopted

policy guidance if agency employee who stated such guidance did not have power to make guidance on behalf of agency).[7]

Finally, no other BIA decision or statement supports Plaintiffs' allegation that BIA changed its position.  As explained in Part II.C.4 *supra*, Interior maintained in February 28, 1986 letter to Congress—which contained "[t]he current views of the Department of the Interior"— that it did not provide for mandatory Secretarial intervention.  AR-000921.  Interior's letter was silent as to perpetual enrollment.[8]  AR-000921-22.  In fact, Interior only *definitively*, i.e., with legal effect, answered these questions with the AS-IA's Decision in January 2020.  Therefore, even if Plaintiffs had not waived the argument, the Court finds that Interior did not arbitrarily or capriciously change its position without sufficient explanation.

## IV.   CONCLUSION

In this APA challenge, the agency below determined the right outcome—for mostly the right reasons.  The AS-IA erred only to the extent that it read the JFA to provide *no* protections for disenrolled members of the Tribe.  Because the AS-IA relied, in part, on that incorrect reading to determine that it cannot (and should not) exercise its discretionary authority to intervene in matters related to JFA, the Court **GRANTS IN PART AND DENIES IN PART** Federal Defendants' [29] Cross-Motion for Summary Judgment and **GRANTS IN PART AND DENIES**

---

[7] The Court only assumes, without deciding, that such a statement, if promulgated by the proper authority, would be policy guidance.  Even if it would have been the agency's position, it would still have no legal effect unless BIA intended it to be binding and BIA applied it in such a way as to be binding.  *See Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002).  Given, as Plaintiffs stated, BIA staff provided only informal guidance to the Tribe, the Court doubts such guidance would have had legal effect.

[8] Plaintiffs also argue that Interior changed its position on the definition of the word "descendant" in the 1986 Tribal constitution.  As the Court has explained in Part II.B, the definition of the word "descendant" is a matter of tribal law.  The relevant questions before this Court are those of federal law.

**IN PART** Plaintiffs' [21] Motion for Summary Judgment.  The Court further **VACATES** the Assistant Secretary for Indian Affairs' January 30, 2020 Decision and **REMANDS** this case to the Assistant Secretary consider further whether, the U.S. Department of the Interior should exercise its discretionary authority to intervene in alleged inequitable provision of services and benefits funded by the JFA—as stated in Plaintiffs' April 2, 2019, Statement of Reasons—in light of the Memorandum Opinion.  An appropriate Order accompanies this Memorandum Opinion.

Dated: January 10, 2022

_____/s/_____

COLLEEN KOLLAR-KOTELLY
United States District Judge